UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                :

GREAT WALL DE VENEZUELA C.A.,        :
            Plaintiff—Counterclaim Defendant, :

                    -v-           :

INTERAUDI BANK,                  :
          Defendant—Counterclaimant—Third- :
Party Plaintiff,                :

                    -v-           :

ICA INTERNATIONAL AUTOMOBILES   :
LIMITED, *et al.*,                 :
               Third-Party Defendants.   :

------------------------------------------------------------X

                               14-CV-2505 (JPO)

                            OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      This action,[1] which concerns a dispute arising from the sale of an automobile

manufacturing plant in Venezuela, raises the issue of the interaction between the standard for

granting interpleader relief in this circuit and the law governing letters of credit.

      Plaintiff Great Wall de Venezuela C.A. ("Great Wall"), the seller of the automobile plant,

sues to collect approximately $11 million that it alleges it is owed by Defendant Interaudi Bank

("Interaudi") pursuant to a letter of credit that Interaudi issued on behalf of the buyers of the

plant, Third-Party Defendants ICA International Automobile Limited ("ICA"), and ICA's two

principals, brothers Antonio and Mohsen Yammine ("the Yammines") (collectively, "the ICA

---

[1] The Court has diversity jurisdiction over the action filed by Great Wall against Interaudi pursuant to 28 U.S.C. § 1332(a)(2), because Great Wall is a citizen of Venezuela, Interaudi is a citizen of New York, and the amount in controversy exceeds $75,000. (Dkt. No. 2 ("Compl.") ¶¶ 6-8.) As noted below, the Court also has diversity jurisdiction over the interpleader complaint. *See infra* note 10.

Defendants"). In turn, Interaudi counterclaims against Great Wall and the ICA Defendants for interpleader relief. It asserts that it is subject to competing claims for the $11 million from Great Wall and the ICA Defendants, and asks the Court to take possession of the disputed funds, release Interaudi from this action, and adjudicate the underlying dispute between Great Wall and the ICA Defendants to determine the rightful owner of the funds.

Now before the Court are three motions. First, Great Wall moves for partial summary judgment on its claims against Interaudi, and for summary judgment dismissing Interaudi's counterclaim for interpleader relief. Second, Interaudi moves for summary judgment on its counterclaim for interpleader relief, and for judgment on the pleadings dismissing Great Wall's claims. Finally, the ICA Defendants request, should the Court grant Interaudi's motion for interpleader relief, to stay the case and to compel arbitration of the underlying dispute between ICA and Great Wall in Venezuela.

The Court heard oral argument on June 8, 2015.

For the reasons that follow, the Court concludes that interpleader relief is not appropriate given the facts of this case. Accordingly, the Court grants summary judgment dismissing Interaudi's counterclaim for interpleader relief, and denies as moot the ICA Defendants' motion to stay the case and compel arbitration. As for Great Wall's claims against Interaudi, Great Wall's motion for partial summary judgment on those claims is denied, and Interaudi's motion for judgment on the pleadings on those claims is granted with respect to the civil theft claim and denied with respect to all other claims.

I.     **Factual Background**

The facts are not in dispute unless otherwise noted.[2]  Prior to July 2013, Franklin Hoet Linares ("Hoet") and Cesar Hirsch Diz ("Hirsch") were the owners of a Venezuelan entity known as Ensamblaje Superior, C.A., or "ESCA."  (Dkt. No. 48 ("Great Wall Counter 56.1") ¶ 5.)[3]  ESCA owned an automobile manufacturing plant ("the Plant") located in the town of Guacara, in Carabobo State, Venezuela.  (*Id.* ¶ 6.)  Hoet and Hirsch are also principals of Great Wall, which owned the Plant's equipment and machinery prior to July 2013.  (*Id.* ¶¶ 7-8.)  Also prior to July 2013, a company owned by the Yammines called Corporacion Automotriz ZGT C.A. leased the Plant and paid rent to Great Wall.  (Dkt. No. 53 ("Yammine Decl.") ¶ 6.)

On June 4, 2013, the Yammines entered into an option contract (the "Option Contract") with Hoet and Hirsch, which gave the Yammines and ICA the option of purchasing the Plant, along with its equipment and machinery, from ESCA and Great Wall, respectively.  (Dkt. No. 46 ("Great Wall 56.1") ¶ 1; Dkt. No. 70 ("ICA Counter 56.1") ¶ 1; Yammine Decl. ¶¶ 3-4; Dkt. No. 54 ("Yammine Aff."), Exs. A-B[4] ("Option Contract").)  The Option Contract made various representations, including that ESCA and Great Wall were "the legal owner[s] and ha[ve] the absolute and unrestricted right, interest and title on the assets [in question], which are free of any encumbrance, . . . expropriation order[,] or notice of expropriation intent issued by any national

---

[2] The Court omits mention of various disputes relevant to the ICA Defendants' motion to stay and compel arbitration, as that motion is denied as moot in light of the determination that interpleader relief is inappropriate here.

[3] This counterstatement is in response to Interaudi's statement of undisputed material facts.

[4] The record includes both the original Spanish-language version of the Option Contract and a version translated into English.  All quotes herein are drawn from the English translation provided, as any dispute over the translation of the Option Contract does not materially affect the disposition of the present motions.

or local government or any governmental body" (Option Contract, Clauses 8.1.7, 8.2.7), and that "[t]he statements made and the information provided by [Hoet and Hirsch] regarding the transactions provided in this Agreement are true and accurate in all substantial aspects, [and] no relevant fact has been concealed from [the Yammines]" (*id.* Clause 8.1.11).[5]

Approximately one month later, on July 3, 2013, the parties to the Option Contract entered into a second contract (the "Contract"), pursuant to which the Yammines and ICA acquired (1) the Plant by acquiring 100% of the outstanding shares of ESCA; and (2) the equipment and machinery through an asset sale by Great Wall.  (Yammine Decl. ¶ 16; Yammine Aff. Exs. C-D[6] ("Contract").)  Under the terms of the Contract, the Yammines and ICA were to pay Great Wall an aggregate of $16 million as consideration for these assets.  (Contract Clause 2.)  At the Contract's closing, the Yammines had already paid Great Wall $5 million.[7]  (Contract Clause 2.1; Great Wall 56.1 ¶ 5.)  The remaining $11 million was to be guaranteed by a letter of credit.  (Contract Clause 2.2; Great Wall 56.1 ¶ 5; ICA Counter 56.1 ¶ 5.)

On July 3, 2013, Mohsen Yammine submitted an application to Interaudi for a letter of credit, on behalf of ICA.  (Yammine Aff. ¶ 22; Dkt. No. 37 ("Interaudi 56.1") ¶ 15; Dkt. No. 36

---

[5] According to Antonio Yammine, government expropriation of private assets is "common" in Venezuela, and therefore he and his brother "placed a high value in [Hoet's and Hirsch's] representations and warranties" that none of the assets in question had been or were about to be expropriated by the Venezuelan government.  (Yammine Decl. ¶ 8.)

[6] Both the original Spanish contract and an English translation are in the record, and, once again, all references in this Opinion are drawn from latter.

[7] Pursuant to the Contract, the Yammines paid Hoet and Hirsch $1.6 million around the time that the Option Contract was executed, and an additional $3.4 million at the signing of the Contract. (Yammine Decl. ¶ 14; Contract Clause 2.)

("Audi Decl."), Ex. A ("Application").)[8]  The application sought issuance of a letter of credit in

the amount of $11,315,000 "to facilitate the payment for the purchase of an automobile assembly

plant in Guacara, Estado Carabobo, Venezuela."  (Application at 1.)  The application specified

that payments were to be made to Great Wall, upon Great Wall's presentation of a proper

demand, in three installments: (1) $4,498,333.33 on December 17, 2013; (2) $3,433,333.33 on

Jun 17, 2013; and (3) $3,383,333.34 on December 17, 2014.  (*Id.*)

Interaudi approved the application on July 5, 2013, and issued letter of credit IMP-009/13

(the "Letter of Credit") that same day, with ICA as the applicant and Great Wall as the

beneficiary, and with the same payment schedule as that requested in the application.  (Interaudi

56.1 ¶ 20; Audi Decl. Ex. B ("Letter of Credit").)  The Letter of Credit states that it is

> available against presentation of beneficiary's draft at 180 Days
> Date, drawn on Interaudi Bank, New York bearing the clause:
> "Drawn under Documentary Letter of Credit No. IMP-009/13["]
> [and] accompanied by the following document:
>
> Beneficiary's Written Statement purportedly signed by an officer
> of Great Wall de Venezuela C.A. stating "We hereby certify that
> Installment No. --- is due in accordance with the contract dated ---
> for the purpose of purchasing shares and assembly plant,
> Automoviles Great Wall in Venezuela."

(Letter of Credit.)  The Letter of Credit further states that its "Place of Issue" is New York, New

York, and that "[e]xcept so far as otherwise expressly stated[,] this [Letter of Credit] is subject to

the 'Uniform Customs and Practice for Documentary Credits' (2007 Revision) fixed by the

International Chamber of Commerce (Publication No. 600)."  (*Id.*)  At some point—it is not

entirely clear when—the ICA Defendants paid Interaudi $11 million in consideration for

---

[8] Interaudi states that the application was submitted on "July 3, 2012."  (Interaudi 56.1 ¶ 15.)
This appears to be a typographical error rather than a factual divergence.  (*See* Great Wall
Counter 56.1 ¶ 15.)

Interaudi's obligation to Great Wall under the Letter of Credit.  (Dkt. No. 71, Transcript of proceedings on June 8, 2015 ("Trans."), at 3:7-23.)

On July 30, 2013, the Venezuelan government issued Presidential Decree No. 269 (the "Decree").  (*See* Dkt. No. 44 ("Golenbock Decl.") Ex. 6 ("Decree").)  The parties dispute the proper translation and legal effect of the Decree.  (*See* Dkt. No. 60 ("Interaudi Counter 56.1") ¶ 18 ("[T]he translation obtained by Interaudi differs in numerous material aspects from the translation obtained by [Great Wall].").)  Interaudi and the ICA Defendants argue that the decree ordered the immediate acquisition of Great Wall's property—including the Plant—for the purposes of expanding the operating capacity of the Venezuelan automotive sector.  (Interaudi 56.1 ¶¶ 23-25; Yammine Aff. ¶ 26.)  Great Wall insists that the Decree announced only the Venezuelan Government's "future intent" to expropriate the Plant and its equipment.  (Great Wall 56.1 ¶ 18; Great Wall Counter 56.1 ¶¶ 23-25; *see also* Dkt. No. 45 ("Brewer-Carias Decl.") ¶¶ 15-16.)

On August 2, 2013, less than a week after the Decree was issued, Hoet visited the office of Interaudi in Miami, Florida, to discuss discounting the Letter of Credit to the sum of $11,007,158.34, which was approximately 97% of the Letter's face value, apparently in exchange for a single, immediate payment, instead of the three payments over a series of months that were contemplated in the Letter of Credit.  (Great Wall Counter 56.1 ¶ 26; Interaudi Counter 56.1 ¶ 19; Yammine Aff. ¶¶ 27-34.)  The parties dispute whether the discounting transaction was ever completed, but agree that, completed or not completed, Interaudi deposited the discounted

sum into one of Great Wall's accounts at Interaudi that same day.  (Interaudi Counter 56.1 ¶ 20; Yammine Decl. ¶ 35.)[9]

Five days after Interaudi deposited the discounted funds into Great Wall's account, the Yammines notified Interaudi of the Decree.  (Yammine Decl. ¶ 36; Audi Decl. Ex. C ("Aug. 7 Yammine Letter").)  In their letter, the Yammines stated that they believed that Great Wall, Hirsch, and Hoet had "breached certain representations and warranties set forth in the contract for the purpose of purchasing shares and assembly plant [*sic*] . . . which was submitted to Interaudi in connection with its issuing the [Letter of Credit]."  (Aug. 7 Yammine Letter at 1.) "As such," the Yammines wrote, "you are hereby notified that any Written Statement signed by an officer of Great Wall purportedly certifying that an Installment is due in accordance with the Contract would not be inconformity [*sic*] with the terms of the [Letter of Credit], and therefore may not be honored on presentation by Interaudi Bank."  (*Id.* at 1-2.)  The Yammines enclosed a copy of the Decree with their letter.  (Audi Decl. ¶ 9.)

Shortly after receiving this letter, on August 14, 2013, Interaudi removed funds representing the discounted value of the Letter of Credit from Great Wall's Interaudi account, where it had previously deposited those funds, and replaced them in Interaudi's own account. (*See* Interaudi Counter 56.1 ¶ 21; Yammine Decl. ¶ 37.)  In a letter dated that same day, Interaudi informed Hoet that it had "decided to reverse and annul the acceptance certificates and related discounting o[f] August 2, 2013."  (Golenbock Decl. Ex. 8.)  Interaudi gave two reasons

---

[9] Great Wall alleges that the discounting transaction was completed upon deposit of the funds into its account at Interaudi on August 2, 2013.  (Great Wall 56.1 ¶¶ 19-20.)  Interaudi admits that "as part of the contemplated discounting transaction, it deposited the stated sum . . . in an account affiliated with [Great Wall]," but it "disputes any characterization [by Great Wall] that the contemplated discounting transaction was completed as of August 2, 2013, or that the contemplated discounting transaction was ever completed."  (Interaudi Counter 56.1 ¶¶ 19-20.)

for this decision.  First, Interaudi explained that the Decree "clearly states" that Great Wall "is the owner of the assembly plant you supposedly sold to ICA," and therefore that Hoet "cannot conclude and certify on August 2, 2013 that the shares and assembly plant have been sold or purchased by ICA."  (*Id.*)  Second, Interaudi stated that Hoet "certainly knew," when he requested that the Letter of Credit be discounted, "that the assets of Great Wall . . . had been expropriated[,] as this was published three days" before the discounting transaction on August 2, 2013.  (*Id.*)  Interaudi concluded the letter by informing Hoet that, despite Interaudi's decision to "reverse" the discounting, Interaudi would continue to honor the Letter of Credit.  Interaudi wrote: "[w]e would also like to inform you that our Letter of Credit . . . of which you are the beneficiary is still valid until December 2014 and will be honored upon proper presentation." (*Id.*)

On December 17, 2013, Hoet and Hirsch wrote to Interaudi with a demand requesting payment of the first installment due under the Letter of Credit.  (Interaudi Counter 56.1 ¶ 24.) Interaudi refused to pay the demand on technical grounds, but also stated that Great Wall's demand "is not in conformity with reality facts [*sic*] per [the Decree]."  (Golenbock Decl. Ex. 9.) Hoet and Hirsch submitted a revised demand ten days later.  (Interaudi Counter 56.1 ¶ 26.)  On January 7, 2014, Interaudi rejected the revised demand on slightly different technical grounds, but again informed Great Wall that its demand "is not in conformity with reality facts per [the Decree]."  (Golenbock Decl. Ex. 10.)

To date, Interaudi has not returned the value of the discounted Letter of Credit to Great Wall's account, nor has it paid Great Wall any amount pursuant to the Letter of Credit. (Interaudi Counter 56.1 ¶ 29.)  The full $11,315,000 value of the Letter of Credit (the "Disputed Funds") remains on deposit with Interaudi.  (Interaudi 56.1 ¶ 31.)

8

## II.      Procedural Background

Great Wall initiated this action against Interaudi on April 9, 2014.  The complaint asserts five common law causes of action against Interaudi, all of which, in essence, demand payment of the Disputed Funds.  Those claims are breach of the letter of credit, conversion, civil theft, unjust enrichment, and "money had and received."  (Dkt. No. 2 ("Compl.") ¶¶ 34-58.)

On May 28, 2014, Interaudi answered the complaint and alleged a counterclaim against Great Wall and a third-party claim against the ICA Defendants for interpleader relief pursuant to Federal Rule of Civil Procedure 22.  (Dkt. No. 10 ("Counterclaim").)  The counterclaim states that "[Great Wall] and [the ICA Defendants] have made adverse and inconsistent claims of ownership and entitlement to possess the Disputed Funds being held by Interaudi" (*id.* ¶ 43), and asserts that "[u]nless the adverse and conflicting claims to the Disputed Funds are disposed of in a single proceeding, Interaudi may be subject to multiple litigations and may be exposed to double liability" (*id.* ¶ 44).  Accordingly, Interaudi requests "to deposit the Disputed Funds in their entirety into the registry of the Court to be held pending a legal determination of which claimant has a superior right to possess the Disputed Funds."  (*Id.* ¶ 47.)

The Court subsequently referred the action to Magistrate Judge Gabriel Gorenstein for general pretrial supervision.  (Dkt. No. 16.)  Before Judge Gorenstein held an initial conference, however, the parties informed the Court that they intended to file various motions, and, in June 2014, the Court stayed discovery pending receipt of those motions.  (Dkt. Nos. 26-28.)  In January 2015, the parties filed the three instant motions.  On June 8, 2015, the Court held argument solely on the issue whether Interaudi is entitled to interpleader relief.  (*See* Dkt. Nos. 64, 66.)  Counsel for Great Wall, Interaudi, and the ICA Defendants were all present and participated in argument.

### III.    Interpleader

The Court begins with Interaudi's motion for summary judgment on its counterclaim for interpleader relief, and Great Wall's motion for summary judgment dismissing the interpleader counterclaim, as the resolution of the interpleader issue will affect the resolution of the other pending motions.

### A.    Legal Standard

"Interpleader is a procedural device used to resolve conflicting claims to money or property.  It enables a person or entity in possession of a tangible res or fund of money (the 'stakeholder') to join in a suit two or more 'claimants' asserting mutually exclusive claims to that stake."  Moore's Federal Practice § 22.02[1] (3d ed. 2013).[10]  Interpleader protects a stakeholder from "having to defend against multiple suits and from the risk of multiple liability or inconsistent obligations."  *Id.*; *see also Bradley v. Kochenash*, 44 F.3d 166, 168 (2d Cir. 1995) ("Historically, a bill of interpleader was an equitable device whose purpose was 'the avoidance of the burden of unnecessary litigation or the risk of loss by the establishment of multiple liability when only a single obligation is owing.'" (quoting *Texas v. Florida*, 306 U.S. 398, 412 (1939))).

---

[10] This Court has diversity jurisdiction over the interpleader counterclaim, brought under Federal Rule of Civil Procedure 22, as the stakeholder (Interaudi) is a citizen of New York (Counterclaim ¶ 5); the two claimants it seeks to interplead (Great Wall and the ICA Defendants) are citizens of states and countries other than New York (*id.* ¶¶ 6-9); and the amount in controversy exceeds $75,000.  *See Truck-a-Tune, Inc. v. Ré*, 23 F.3d 60, 62 (2d Cir. 1994) ("Because the stakeholder's citizenship is diverse to that of all the [claimants], and the amount in controversy exceeds [the jurisdictional threshold], the Court has subject matter jurisdiction [over a Rule 22 interpleader action] under the diversity statute."); *see also* Moore's Federal Practice § 22.04[2][a].

Interpleader litigation generally proceeds in two stages.  At the first stage, the court determines whether interpleader is appropriate on the facts of the case.  If the court determines that interpleader is warranted, the court continues to stage two, at which it adjudicates the adverse claims and distributes the disputed stake to one or both of the claimants.  *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 317-18 (S.D.N.Y. 2014); *see also* Moore's Federal Practice § 22.03[1]-[2].  The Court is presently concerned with the first stage.

Interaudi seeks interpleader relief under Federal Rule of Civil Procedure 22.[11]  As relevant here, Rule 22 allows interpleader by a defendant to an action— "defensive interpleader"—where the defendant is "exposed to similar liability."  Fed. R. Civ. P. 22(a)(2).[12] To assert defensive interpleader, the defendant must satisfy three requirements.  First, it must "legitimately fear[] multiple liability directed against a single fund."  *Union Cent. Life Ins. Co. v. Berger*, No. 10 Civ. 8408 (PGG), 2012 WL 4217795, at *6 (S.D.N.Y. Sept. 20, 2012) (internal quotation marks omitted); *accord Gilmore*, 45 F. Supp. 3d at 318 (stating that "the appropriateness of an interpleader action rests on whether the plaintiff has a real and reasonable fear of double liability or vexatious, conflicting claims against the single fund"); *see also* Moore's Federal Practice § 22.02[4].  Second, "two or more claimants must be adverse to each other and the fund."  *Id.*  Third, the defendant must frame a defensive interpleader by way of a cross-claim or counterclaim.  *6247 Atlas Corp. v. Marine Ins. Co.*, 155 F.R.D. 454, 462

---

[11] Interaudi's request is therefore one for "rule interpleader," as opposed to "statutory interpleader."  The two types of interpleader serve the same purpose and perform the same function, and differ only in their requirements for subject matter jurisdiction, venue, and service of process.  Moore's Federal Practice § 22.02[3].

[12] Alternatively, a stakeholder can seek interpleader as a plaintiff in an initial proceeding, by filing a complaint against the claimants.  Fed. R. Civ. P. 22(a)(1); *see also* Moore's Federal Practice § 22.02[1].

(S.D.N.Y. 1994); *see* Fed. R. Civ. P. 22(a)(2). The party seeking interpleader relief bears the burden of establishing that these requirements are satisfied. *J.B.I. Indus., Inc. v. Suchde*, No. 99 Civ. 12435 (AGS), 2000 WL 1174997, at *14 (S.D.N.Y. Aug. 17, 2000). The Court elaborates only on the first requirement, which is the subject of the parties' disagreement concerning whether interpleader is appropriate in this case.

Several principles guide a court's determination whether a stakeholder legitimately fears multiple liability with respect to a single fund. First, fear of multiple liability need not be supported by an existing legal action. Rather, "the case law consistently supports the notion that interpleader may be utilized even if some of the alleged claims have not yet been asserted." *6247 Atlas Corp.*, 155 F.R.D. at 463 (citing cases). It is sufficient that the stakeholder "faces even the prospect of adverse claims being asserted against property in its possession." *Glenclova Inv. Co. v. Trans-Res., Inc.*, 874 F. Supp. 2d 292, 302 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also Fid. Brokerage Servs., LLC v. Bank of China*, 192 F. Supp. 2d 173, 178 (S.D.N.Y. 2002) ("[T]he language of . . . Rule 22 . . . allow[s] for the invocation of interpleader for the *possibility* of prospective claims." (internal quotation marks omitted)). The standard is not without boundaries, however, and interpleader is not appropriate when the party seeking interpleader offers "only the barest speculation" that such claims will be interposed. *J.B.I. Indus.*, 2000 WL 1174997, at *15 (quoting *Pine Run Props., Inc. v. Pine Run Ltd.*, No. 90 Civ. 6289 (PKL), 1991 WL 280719, at *10 (S.D.N.Y. Dec. 26, 1991)).

Second, "[t]he availability of interpleader does not depend on the merits of the potential claims against the stakeholder." *William Penn Life Ins. Co. of N.Y. v. Viscuso*, 569 F. Supp. 2d 355, 359 (S.D.N.Y. 2008); *see also* Moore's Federal Practice § 22.03[1][a] (same). A leading treatise notes that "it is immaterial whether the stakeholder believes that all the claims against the

fund are meritorious.  Indeed, in the usual case, at least one of the claims will be quite tenuous."
7 Charles Alan Wright et al., Federal Practice and Procedure § 1704, at 544 (3d ed. 2001)
(footnote omitted).  A stakeholder "need only have a good faith concern about duplicitous
litigation and multiple liability if it responds to the requests of certain claimants and not to
others."  *Bank of New York v. First Millennium, Inc.*, No. 06 Civ. 13388 (CSH), 2008 WL
953619, at *6 (S.D.N.Y. Apr. 8, 2008) (quoting *Sotheby's, Inc. v. Garcia*, 802 F. Supp. 1058,
1065 (S.D.N.Y. 1992)).  But once again, this liberal standard has limits.  A plaintiff's fear of
multiple liability must be "real and reasonable," *Wash. Elec. Coop., Inc. v. Paterson, Walke &
Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir. 1993), and "plainly frivolous claim[s]" by the purported
claimants will not support interpleader relief, *Krishna v. Colgate Palmolive Co.*, No. 90 Civ.
4116 (CSH), 1991 WL 125186, at *2 (S.D.N.Y. July 2, 1991).

Finally, there is a trend "toward increasing the availability of interpleader," *6247 Atlas
Corp.*, 155 F.R.D. at 462, fueled in large part by the Supreme Court's instruction that
interpleader should be "liberally construed," *see Ashton v. Josephine Bay Paul & C. Michael
Paul Found., Inc.*, 918 F.2d 1065, 1069 (2d Cir. 1990) (quoting *State Farm Fire & Cas. Co. v.
Tashire*, 386 U.S. 523, 533 (1967)); *see also Citigroup Global Mkts., Inc. v. KLCC Invs., LLC*,
No. 06 Civ. 5466 (LBS), 2007 WL 102128, at *7 (S.D.N.Y. Jan. 11, 2007) (citing *Tashire*, 386
U.S. at 533, for the proposition that "interpleader is an equitable remedy that should be applied
liberally").  Ultimately, however, because interpleader is an equitable remedy, it is within the
district court's discretion to determine whether the equities warrant interpleader relief.  *See
Truck-a-Tune, Inc. v. Ré*, 23 F.3d 60, 63 (2d Cir. 1994); *see also Am. Airlines, Inc. v. Block*, 905
F.2d 12, 14 (2d Cir. 1990) (per curiam).

**B.      Discussion**

Interaudi contends that interpleader is appropriate here because Interaudi may be subject to multiple liability with respect to the approximately $11 million constituting the Disputed Funds, as both Great Wall and the ICA Defendants have claimed a stake to them—Great Wall by bringing this action demanding that Interaudi honor the Letter of Credit and pay Great Wall the funds, and the ICA Defendants by directing Interaudi, by letter, not to honor the Letter of Credit. (Dkt. No. 35 ("Interaudi Br.") at 5-6.)  Great Wall contends that, due to the nature of the law governing letters of credit, Interaudi is not subject to multiple liability.  Specifically, Great Wall argues that, were Interaudi to pay Great Wall the Disputed Funds pursuant to the Letter of Credit, it would face no real fear of liability to the ICA Defendants for those same funds.  (Dkt. No. 47 ("Great Wall Opp.") at 2-4.)  To resolve this issue, a brief foray into the law governing letters of credit is necessary.

**1.      Letters of Credit and the "Independence Principle"**

Letters of credit were originally devised to reduce the risk of nonpayment in international trade.  *See Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 682 (2d Cir. 1983) (citing Cassondra E. Joseph, *Letters of Credit: The Developing Concepts and Financing Functions*, 94 Banking L.J. 816 (1977)).  They are commercial instruments that provide a seller of goods a guaranteed means of payment from a reliable third party (usually a bank) in lieu of relying on the credit of a buyer.  *See ACE Am. Ins. Co. v. Bank of the Ozarks*, No. 11 Civ. 3146 (PGG), 2014 WL 4953566, at *6 (S.D.N.Y. Sept. 30, 2014).  A typical letter of credit transaction involves "three separate and independent relationships": (1) "an underlying sale of goods contract between buyer and seller," (2) "an agreement between a bank and its customer (buyer) in which the bank undertakes to issue a letter of credit," and (3) "the bank's resulting

engagement to pay the beneficiary (seller) providing that certain documents presented to the bank"—the "demand"—"conform with the terms and conditions of the credit issued on the customer's behalf." *Voest-Alpine Int'l Corp.*, 707 F.2d at 682.

"The great utility of the letter of credit derives from the fact that these three relationships are utterly independent of one another." *Alaska Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813, 815 (2d Cir. 1992). That is, "the issuing bank's obligation to honor drafts drawn on a letter of credit by the beneficiary is separate and independent from any obligation of its customer to the beneficiary under the sale of goods contract and separate as well from any obligation of the issuer to its customer under the agreement." *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 741 (2d Cir. 1999) (quoting *First Commercial Bank v. Gotham Originals, Inc.*, 475 N.E.2d 1255, 1259 (N.Y. 1985)); *see also Voest-Alpine Int'l Corp.*, 707 F.2d at 682 ("[T]he bank's payment obligation to the beneficiary is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction."). The issuing bank must honor a proper demand "even though the beneficiary has breached the underlying contract; even though the insolvency of the [applicant] renders reimbursement impossible; and notwithstanding supervening illegality, impossibility, war or insurrection." *Semetex Corp. v. UBAF Arab Am. Bank*, 853 F. Supp. 759, 770 (S.D.N.Y. 1994) (internal citations omitted) (citing *Centrifugal Casting Mach. Co. v. Am. Bank & Trust Co.*, 966 F.2d 1348, 1352 (10th Cir. 1992); *Wood v. R.R. Donnelley & Sons Co.*, 888 F.2d 313, 318 (3d Cir. 1989); *KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 16 (2d Cir. 1979)), *aff'd*, 51 F.3d 13 (2d Cir. 1995) (per curiam).

"This independence principle is predicated upon the fundamental policy that a letter of credit would lose its commercial vitality if before honoring drafts the issuer could look beyond the terms of the credit to the underlying contractual controversy or performance between its

customer and the beneficiary." *Twp. of Burlington v. Apple Bank for Sav.*, No. 94 Civ. 6116 (JFK), 1995 WL 384442, at *5 (S.D.N.Y. June 28, 1995) (citing *KMW Int'l*, 606 F.2d at 16). Were the customer permitted to "pressure or collude with the bank to dishonor" the letter of credit, the "very principle upon which the commercial utility of letters of credit rests" would be destroyed. *E&H Partners v. Broadway Nat'l Bank*, 39 F. Supp. 2d 275, 285 (S.D.N.Y. 1998) (citing *Voest-Alpine Int'l Corp.*, 707 F.2d at 682). Accordingly, the independence principle "is universally viewed as essential to the proper functioning of letters of credit and to their particular value." *Semetex Corp.*, 853 F. Supp. at 770.

The independence principle is embodied in the Uniform Customs and Practices for Documentary Credits ("UCP"), a "compilation of internationally accepted commercial practices, first issued in 1930 by the International Chamber of Commerce and revised every ten years since." *Alaska Textile Co.*, 982 F.2d at 816 (footnote omitted). The UCP "applies to most letters of credit . . . because issuers generally incorporate it into their [letters of] credit[]," *id.*, and both parties concede, as they must, that the UCP applies here. (*See* Letter of Credit ("Except so far as otherwise expressly stated this documentary credit is subject to the 'Uniform Customs and Practice for Documentary Credits' (2007 Revision) fixed by the International Chamber of Commerce (Publication No. 600)."); Great Wall Opp. at 2 n.1 (conceding that "the letter of credit issued by Interaudi . . . is governed by the UCP"); Trans. at 6:18 (Counsel for Interaudi: "Everyone agrees that the UCP applies.").) The applicable article of the UCP provides that

> [a] credit by its nature is a separate transaction from the sale or other contract on which it may be based. Banks are in no way concerned with or bound by such contract, even if any reference whatsoever to it is included in the credit. Consequently, the undertaking of a bank to honour, to negotiate or to fulfill any other obligation under the credit is not subject to claims or defences by the applicant resulting from its relationships with the issuing bank or the beneficiary.

UCP, Article 4(a) (2007).

In sum, pursuant to the "independence principle," when the beneficiary of a letter of credit makes a demand that conforms to the terms of that letter, the issuing bank must pay the amount due. The issuing bank may not refuse payment for reasons related to its contract with the applicant or the underlying contract between the beneficiary and the applicant. The rule is simple: "If the documents comply with the terms of the credit, the issuer's duty to pay is absolute, regardless of what occurs in the related transaction." *ACE Am. Ins. Co.*, 2014 WL 4953566, at *7 (quoting *Alaska Textile Co.*, 982 F.2d at 816) (internal quotation marks and ellipsis omitted).[13]

### 2.    The Fraud Exception

Fraud is the "well-established exception" to the rule that an issuing bank must pay when a beneficiary submits documents that conform on their face to the terms of the letter of credit. *Semetex Corp.*, 853 F. Supp. at 773 (citing, *inter alia*, *Rockwell Int'l Sys., Inc. v. Citibank, N.A.*, 719 F.3d 583 (2d Cir. 1983); *KMW Int'l*, 606 F.2d 10). Although the UCP does not provide for a fraud defense, the parties agree that New York law applies here, and "New York law . . . recognizes the availability of this defense with regard to letters of credit governed by the UCP." *Semetex Corp.*, 853 F. Supp. at 773 (citing *Rockwell*, 719 F.2d at 588; *United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 360 N.E.2d 943, 947 n.2 (N.Y. 1976)).

---

[13] The "documents" refer to the written demand sent by the beneficiary. As noted above, the Letter of Credit here requires, by way of documents, a written statement, "purportedly signed by an officer of Great Wall de Venezuela C.A.," and stating, "We hereby certify that Installment No. --- is due in accordance with the contract dated --- for the purpose of purchasing shares and assembly plant, Automoviles Great Wall in Venezuela." (Letter of Credit.)

Specifically, section 5-109(a) of the New York Uniform Commercial Code ("NYUCC")

provides:

> If a presentation is made that appears on its face strictly to comply
> with the terms and conditions of the letter of credit, but a required
> document is forged or materially fraudulent, or honor of the
> presentation would facilitate a material fraud by the beneficiary on
> the issuer or applicant . . . [t]he issuer shall honor the presentation,
> if honor is demanded by [certain specified persons]; [but] [t]he
> issuer, acting in good faith, may honor or dishonor the presentation
> in any other case.

In addition, if an applicant believes that there has been fraud in the underlying transaction, or that

a required document is forged or materially fraudulent, the applicant can apply to "a court of

competent jurisdiction" to "enjoin the issuer from honoring a presentation."  NYUCC § 5-

109(b).

The fraud exception, however—whether raised as a defense to nonpayment by an issuing

bank, or by an applicant in requesting an injunction against payment on a letter of credit—is

limited.  "[B]ecause the smooth operation of international commerce requires that requests for

payment under letters of credit not be routinely obstructed by prepayment litigation, the fraud

exception to the independence principle 'is a narrow one' that is only available on a showing of

'intentional fraud.'"  *ACE Am. Ins. Co.*, 2014 WL 4953566, at \*11 (quoting *BasicNet S.p.A. v.

CFP Servs. Ltd.*, 4 N.Y.S.3d 27, 37 (N.Y. App. Div. 1st Dep't 2015) (quoting *All Serv.

Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A.*, 921 F.2d 32, 35

(2d Cir. 1990))) (internal quotation marks omitted).  The fraud must also be "material," and

material fraud "occurs only when the beneficiary has no colorable right to expect honor and

where there is no basis in fact to support such a right to honor."  NYUCC § 5-109(a) & cmt. 1.

### 3.    Application to This Case

With these principles in mind, the Court concludes that interpleader relief is not

appropriate in this case.  In so holding, the Court finds persuasive the reasoning of the court in

*Lafayette Corp. v. Bank of Boston Int'l S.*, 723 F. Supp. 1461 (S.D. Fla. 1989).  That case

involved a situation that was similar to that here: (1) a bank issued a letter of credit to support an

underlying contract for the sale of goods; (2) the bank received a demand on the letter of credit

from the beneficiary and an instruction to dishonor the demand from the applicant; and (3) the

bank sought interpleader relief, claiming that it was subject to multiple and conflicting liabilities.

*Id.* at 1462-63.  Relying on the unique nature letters of credit, the court denied interpleader relief.

The court reasoned as follows:

> Rule 22 permits interpleader only if the interpleading Plaintiff "is
> or may be exposed to double or multiple liability."  There is no
> such double or multiple liability here.  As previously mentioned,
> the claims of [the beneficiary] and [the applicant] arise under
> separate contractual relationships and cannot engender the multiple
> liability contemplated by Rule 22.  Whereas [the issuing bank's]
> liability to [the beneficiary] is based upon [the beneficiary's] status
> as a beneficiary of the letter of credit, [the bank's] liability to [the
> applicant] is based upon [the applicant's] status as [the bank's]
> customer.

*Id.* at 1465.  Due to the nature of these two separate contracts, the court concluded, the

beneficiary and the applicant had claims to *different* funds.  While the applicant had a claim to

the funds it had paid the bank in consideration for the issuance of the letter of credit, which the

bank had offered to the court for deposit, the beneficiary had no such claim; rather, the

beneficiary had a claim to the bank's *own* funds, which were due to the beneficiary under the

letter of credit.  *Id.* at 1465-66.

The holding of *Lafayette Corp.* is broad, applying with equal force to all cases in which a

bank seeks interpleader on the ground that it is liable to both the applicant and beneficiary of a

letter of credit.  Under the reasoning of *Lafayette Corp.*, due to the very nature of the

independence principle—by which a letter of credit transaction involves three separate,

independent contracts and three corresponding obligations—liability on the part of the bank on

one of these contracts is not inconsistent with liability on another, and is therefore not the kind of

"multiple liability" contemplated by Rule 22.  *See also Dallas Bank & Trust Co. v.*

*Commonwealth Dev. Corp.*, 686 S.W.2d 226, 231 (Tex. App. 1984) (denying interpleader on

similar facts, and holding that "[t]he risk that payment of the draft [on the letter of credit] might

have left the bank without a right of reimbursement against [the applicant] was not the kind of

exposure to multiple liability that would justify interpleader relief").  Applying the reasoning of

*Lafayette Corp.* here, the Court concludes that Interaudi's claim that it is subject to multiple

liability for the Disputed Funds fails.  Interaudi is subject to two independent obligations, and,

even if it is ultimately liable on both, those liabilities are not inconsistent.

      In the alternative, even if the Court assumes that a bank's liability to both the applicant

and the beneficiary of a letter of credit is the kind of multiple liability properly redressed by

interpleader, Interaudi has not met its burden of establishing that it faces a "real and reasonable"

fear of liability to the ICA Defendants.[14]

      Interaudi's argument as to the nature of its potential liability to the ICA Defendants is not

entirely clear.  In the briefing, Interaudi states merely that the ICA Defendants have notified it of

fraud in the underlying transaction and "directed [it] not to honor the [Letter of Credit]."

(Interaudi Br. at 5).  Interaudi elaborated on this statement at oral argument, explaining that

because the ICA Defendants have warned Interaudi of potential fraud in the underlying

---

[14] Of course, there is no dispute that Interaudi faces a real and reasonable fear of liability to Great
Wall, as Great Wall initiated this action to collect the Disputed Funds.

transaction, they may have a claim for "wrongful honor" against Interaudi if Interaudi pays Great Wall pursuant to the Letter of Credit.  (Trans. at 5:16-17.)  Thus, Interaudi contends, it is faced with a demand from Great Wall for the Disputed Funds if it does not honor the Letter of Credit, and a threat of suit by the ICA Defendants for those same funds if it honors the Letter of Credit, and therefore interpleader relief is warranted.

This precise argument was rejected in *Royal Bank of Canada v. Weiss*, 567 N.Y.S.2d 707 (N.Y. App. Div. 1st Dep't 1991).  In that case, the Royal Bank of Canada, which had issued a letter of credit, was informed by the applicant to that letter of credit that there was fraud in the underlying transaction between the applicant and the beneficiary.  Claiming to fear liability to both parties, the Royal Bank of Canada refused to pay the beneficiary's demand and sought interpleader relief.  *Id.* at 708.  Relying on New York law, the court concluded that interpleader relief was not warranted.  The court explained that, although New York law allows for an issuer who has been informed of potential fraud in the underlying transaction to be liable to the beneficiary if it chooses not to honor a letter of credit, it does not provide a cause of action for the applicant if the issuer decides to honor a letter of credit in such circumstances.  *Id.* at 708-09. Thus, the court concluded, "[w]hile there are here involved adverse claims to a particular fund, . . . these claims do not subject the present interpleader plaintiff to multiple liability; the Bank could have avoided all liability by simply honoring the [beneficiary's] demands for payment of the letters of credit."  *Id.* at 709.

Interaudi contends that *Royal Bank of Canada* is no longer good law due to an amendment to the NYUCC since that case was decided.  Specifically, Interaudi points to an addition to the "remedies" provision of the NYUCC, which states that "[i]f an issuer . . . honors a draft or demand in breach of its obligation to the applicant, the applicant may recover damages

resulting from the breach."  NYUCC § 5-111(b).  Interaudi argues that this new provision gives

an applicant a right of action where an issuer pays a beneficiary after being notified of fraud in

the underlying transaction.  In these circumstances, Interaudi argues, an applicant may sue the

issuer for "wrongful honor."  (*See* Trans. at 5:9-12, 5:15-17, 8:11-15, 23:10-14.)

Interaudi's argument is without merit because it relies on a misunderstanding of what is

meant by the term "wrongful honor."  Wrongful honor occurs when an issuer honors a letter of

credit where the demand does not comply with the terms specified by that letter, thereby

breaching the issuer's obligations to the applicant—obligations which include paying a demand

only where that demand conforms to the requirements of the letter of credit.  *See* NYUCC § 5-

111, NYSBA Comm. Report (cross-referencing § 5-108(a) for the "duty to dishonor presentation

that does not appear to comply," and § 5-108(i) for the issuer's "entitlement to reimbursement"

upon honor).[15]  Nothing in the NYUCC suggests that wrongful honor includes the situation at

issue here, where an issuer honors a letter of credit after being informed of fraud in the

underlying transaction.

In fact, the NYUCC—as it did when *Royal Bank of Canada* was decided—allows an

issuer to pay a beneficiary upon receiving a demand that complies with the terms of a letter of

credit and obtain reimbursement from the applicant, even where the issuer is on notice of fraud

in the underlying transaction.  *See* NYUCC § 5-109(a) ("The issuer, acting in good faith, may

---

[15] The cause of action for wrongful honor is not new; indeed, applicants sued issuers prior to the amendment for honoring non-conforming demands.  *See, e.g.*, *Oei v. Citibank, N.A.*, 957 F. Supp. 492 (S.D.N.Y. 1997) (granting summary judgment to the plaintiffs on wrongful honor claim where the bank disregarded numerous discrepancies in the documents submitted by the beneficiary).  The change to the code identified by Interaudi merely "explicitly state[s]" that such a suit is possible, and identifies the damages permitted when such a suit is successful.  NYUCC § 5-111(b) & NYSBA Comm. Report.

honor or dishonor" a conforming presentation even where "honor of the presentation would

facilitate a material fraud by the beneficiary on the issuer or applicant."); § 5-108(i) ("An issuer

that has honored a presentation as permitted or required by this article . . . is entitled to be

reimbursed by the applicant in immediately available funds not later than the date of its payment

of funds."); *see also* 4A Robert L. Haig, New York Practice Series—Commercial Litigation in

New York State Courts § 69:5 (3d ed. 2010) ("Even if the issuer is advised by the applicant that

there is a forged or fraudulent document or that there is fraud in the transaction, the issuer may

consider erring on the side of paying after careful scrutiny of the document, because a good faith

honor of the presentation is expressly allowed under the circumstances and does not jeopardize

the issuer's reimbursement right." (citing NYUCC §§ 5-109(a), 5-108(i))).[16]  Thus, while failure

to pay after receiving a complying demand subjects Interaudi to potential liability to Great Wall,

payment on such a demand cannot subject Interaudi to liability to the ICA Defendants, even if

the ICA Defendants are correct that Great Wall engaged in fraud in the underlying transaction.

Accordingly, Interaudi has not met its burden of establishing that it has a "real and reasonable

fear" of multiple liability.[17]  In support of this conclusion, the Court notes that, at oral argument

---

[16] Almost identical provisions were in place at the time of the *Royal Bank of Canada* decision,
and were relied on by the court in that case.  *See* NYUCC § 5-114(2)(b) (1982) ("[I]n all other
cases as against its customer, an issuer acting in good faith may honor the draft or demand for
payment despite notification from the customer of fraud, forgery or other defect not apparent on
the face of the documents . . . ."); § 5-114(3) (1982) ("Unless otherwise agreed an issuer which
has duly honored a draft or demand for payment is entitled to immediate reimbursement of any
payment made under the credit . . . ."); *see also Royal Bank of Canada*, 567 N.Y.S.2d at 708
(citing NYUCC § 5-114).

[17] This case is distinct from *Algemene Bank Nederland, N.V. v. Soysen Tarim Urunleri Dis
Ticaret Ve Sanayi, A.S.*, 748 F. Supp. 177 (S.D.N.Y. 1990), in which the court granted
interpleader relief.  In that case, the bank that had issued the letter of credit cited competing
claims for the funds secured by that letter from the beneficiary of the letter of credit, on the one
hand, and a party with a lien on that beneficiary, on the other—not, as here, the beneficiary and
the applicant to the letter of credit.

on the pending motions, when the ICA Defendants were asked whether they would have a cause of action against Interaudi were Interaudi to pay Great Wall upon receiving a conforming demand, the ICA Defendants replied with an adamant "no."  (Trans. at 20:17-21:6.)

The Court's conclusion is consistent with, and warranted by, the unique nature of letters of credit and the need for letters of credit to be reliable and fluid to maintain their key function in international trade.  *See Voest-Alpine Int'l Corp.*, 707 F.2d at 682 ("When analyzing [the law applied to commercial letters of credit,] the unique characteristics of a letter of credit must be kept firmly in mind.  Otherwise, a court may unknowingly paint broadly over the letter of credit's salient features and compromise its reliability and fluidity.").  Were an issuing bank permitted to interplead the applicant and the beneficiary of a letter of credit whenever a beneficiary complained of fraud in the underlying transaction, letters of credit would be deprived of "their chief virtue of predictable reliability as a payment mechanism."  *Id.*

Moreover, the contrary conclusion in this case would allow an issuing bank to use the low standard for pleading interpleader in this circuit to circumvent the high showing necessary to raise a fraud defense to nonpayment of a letter of credit merely by alleging "fraud" and demanding interpleader relief.  Likewise, applicants could circumvent the high showing necessary to obtain a court injunction against payment on a letter of credit merely by notifying the issuer of fraud and encouraging it to seek interpleader.  The commentary to the NYUCC explicitly warns against such an outcome.  It "cautions against granting 'similar relief'" to injunction against honor in the form of "interpleader, declaratory judgment, or attachment," where such an injunction is not appropriate, and states that "[c]ourts should not allow the sacred cow of equity to trample the tender vines of letter of credit law."  *See* NYUCC § 5-109 cmt. 5 (internal quotation marks omitted).  Various commentators have expressed similar concerns.  *See*

24

3 James J. White et al., Uniform Commercial Code § 26.38 (6th ed. 2015) (arguing that, "[b]y playing Pontius Pilate," an issuer should not be able to use interpleader to "avoid not only the responsibility of deciding who is entitled to the money but also the cost and grief of injunction suits"); A.S. Pratt & Sons, Law of Letters of Credit ¶ 11.07 (updated 2013) ("[T]he form of the action should not restrict application of credit rules such as the independence principle and the strict compliance standard.").

For these reasons, Interaudi's motion for summary judgment of interpleader is denied, and Great Wall's motion for summary judgment dismissing the interpleader claim is granted. The Court does not reach the second stage of interpleader, at which it would decide the merits of the underlying dispute between the ICA Defendants and Great Wall. Accordingly, the ICA Defendants' motion to compel arbitration of this underlying dispute is denied as moot.

Great Wall's five claims against Interaudi remain, and are the subject of competing motions. First, Great Wall seeks summary judgment on two of these five claims—namely, breach of the Letter of Credit and conversion. Second, Interaudi moves for judgment on the pleadings on the four tort claims brought by Great Wall: conversion, civil theft, money had and received, and unjust enrichment. The Court turns to these motions now.

## IV.   Interaudi's Motion for Judgment on the Pleadings

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Courts evaluate a Rule 12(c) motion for judgment on the pleadings under the same standard as a Rule 12(b)(6) motion for failure to state a claim. *See United States ex rel. Krol v. Arch Ins. Co.*, 46 F. Supp. 3d 347, 349 (S.D.N.Y. 2014) (citing *Nicholas v. Goord*, 430 F.3d 652, 657 n.8 (2d Cir. 2005)). Thus, [the Court] accept[s] all factual allegations in the complaint as true and draw[s] all

reasonable inferences in plaintiff's favor." *In re Thelen LLP*, 736 F.3d 213, 218 (2d Cir. 2013). "To survive a Rule 12(c) motion, the complaint must contain sufficient factual matter to 'state a claim to relief that is plausible on its face.'" *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Judgment on the pleadings "is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

A.      **The Independent Tort Rule**

Interaudi first argues that Great Wall's tort claims suffer "a common fatal flaw," namely that, "[a]t their core," they "arise[] from the alleged [d]iscounting [a]greement between [Great Wall] and Interaudi," and are therefore barred by Florida law, under which "an action in tort is inappropriate where the basis of the suit is a contract."  (Interaudi MSJ Br. at 11  (quoting *Gambolati v. Sarkisian*, 622 So. 2d 47, 50 (Fla. Ct. App. 4th Dist. 1993) (per curiam)) (internal quotation marks omitted).)  Interaudi's argument is rooted in Florida's "independent tort doctrine," under which, "where parties are in contractual privity, a party must allege action independent of a breach of contract to bring forward a claim in tort." *Strickland v. Burch*, No. 13 Civ. 1383 (JBT), 2014 WL 3417611, at *1 (M.D. Fla. July 14, 2014).  Assuming without deciding that Florida law applies to Great Wall's four tort claims, the Court rejects this argument.

First, it is possible that Florida's independent tort rule is a "simple predecessor" of the "contractual privity economic loss rule," which similarly bars a tort action to recover solely economic damages "where a defendant has not committed a breach of duty apart from a breach of contract." *Tiara Condo. Ass'n, Inc. v. Marsh, USA, Inc.*, 991 F. Supp. 2d 1271, 1279 (S.D.

Fla. 2014).  Under this view, the Florida Supreme Court's recent decision in *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399, 402 (Fla. 2013)—which restricted the application of the economic loss rule to cases involving products liability—"necessarily swept with it the corollary concept of the 'independent tort rule,'" such that the independent tort rule, like the economic loss rule, now applies only in products liability cases.  *Tiara Condo. Ass'n, Inc. v. Marsh, USA, Inc.*, 991 F. Supp. 2d at 1279.  Courts disagree as to whether this is the correct reading of the Florida Supreme Court's decision in *Tiara*.  *Compare, e.g.*, *id.* (stating that limiting the independent tort rule to the products liability context "may be a logical and necessary implication of *Tiara*"); *with, e.g.*, *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1318 (S.D. Fla. 2014) ("*Tiara* did not upset 'fundamental contractual principles' which continue to delineate the general boundary between contract law and tort law regardless of the breadth of the economic loss doctrine."  (citing *Tiara*, 110 So. 3d at 408 (Pariente, J., concurring)).

The Court need not resolve this issue because, even if the independent tort rule remains applicable to this action after *Tiara*, that rule does not mandate the dismissal of Great Wall's tort claims.  The tort claims are not, as Interaudi contends, disguised claims for breach of the discounting agreement.  Rather, the complaint alleges that the discounting agreement was properly executed when Great Wall gave Interaudi the approximately $11 million due under that agreement, and that, *after* performance of the agreement, Interaudi essentially stole the money from Great Wall by removing it from Great Wall's account without its permission.  Indeed, on the facts as pleaded, it is not clear that Great Wall could bring a claim against Interaudi for breach of the discounting agreement.[18]  Great Wall's tort claims are sufficiently independent of

---

[18] Great Wall has not asserted such a claim.  Great Wall's sole breach of contract claim is for breach of the Letter of Credit.  (*See* Compl. ¶¶ 34-39.)

any claim of breach of the discounting agreement so as not to be barred by the independent tort rule. *See Cafaro v. Zois*, No. 15 Civ. 80150 (BB), 2015 WL 3821752, at \*16 (S.D. Fla. June 2, 2015) (holding that, under Florida law, "a tort claim can be stated . . . where the plaintiff has alleged conduct that does not itself constitute breach of the contract at issue"). Interaudi's motion for judgment on the pleadings on this basis is denied.

### B.    Civil Theft

Next, Interaudi argues that Great Wall's civil theft claim should be dismissed because the complaint does not plead that Interaudi had the requisite felonious intent to commit civil theft. The parties agree that Florida law applies to the civil theft claim. Florida's civil theft statute, Florida Statutes § 772.11, affords a private cause of action for treble damages for a violation of Florida's criminal theft law. To state a claim under this statute, a plaintiff must allege that a defendant "(1) knowingly (2) obtained or used, or endeavored to obtain or use, [the plaintiff's] property with (3) 'felonious intent' (4) either temporarily or permanently to (a) deprive [the plaintiff] of its right to or a benefit from the property or (b) appropriate the property to [the defendant's] own use or to the use of any person not entitled to the property." *United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (citing, *inter alia*, Fla. Stat. §§ 772.11, 812.014). As relevant here, "felonious intent" in this context requires that a defendant have, "prior to the commission of the act, an intent to commit a theft." *Rosen v. Marlin*, 486 So. 2d 623, 625 (Fla. Ct. App. 3d Dist. 1986).

Applying these principles here, the Court concludes that Great Wall has not alleged any facts that would support a plausible claim that Interaudi acted with felonious intent in removing the $11 million from Great Wall's bank account. Rather, Great Wall merely alleges, in conclusory fashion, that Interaudi "knowingly, intentionally and illegally" converted Interaudi's

money for its own use.  (Compl. ¶ 47.)  These bare allegations are insufficient to support an

allegation of felonious intent.  In fact, the allegations in the complaint that Interaudi immediately

informed Great Wall that it had removed the funds, and explained that it had done so because it

believed that Great Wall had fraudulently obtained the funds from Interaudi, lead to the

conclusion that Interaudi acted in good faith, and not with felonious intent.  (Compl. ¶¶ 24-26.)

Accordingly, the civil theft claim is dismissed.

## V.  Great Wall's Motion for Partial Summary Judgment

Finally, Great Wall moves for summary judgment on two of its five claims against

Interaudi—namely, breach of the Letter of Credit and conversion.  (Dkt. No. 43 ("Great Wall

Br.") at 6.)  This motion is premature.  The parties have not engaged in any formal discovery,

and discovery is presently stayed pending the outcome of the present motions.  (*See* Dkt Nos. 26-

28.)  While Federal Rule of Civil Procedure 56 allows a party to move for summary judgment

before discovery is complete, such a motion is successful "[o]nly in the rarest of cases" because

"[t]he nonmoving party must have had the opportunity to discover information that is essential to

[its] opposition to the motion for summary judgment."  *Hellstrom v. U.S. Dep't of Veterans

Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (internal quotation marks omitted).

Here, Interaudi raises several probable disputes of material fact concerning Great Wall's

claims of breach of the Letter of Credit and conversion.  First, as to the claim for breach of the

letter of credit, Interaudi contends that Great Wall engaged in intentional, material fraud in the

underlying transaction by concealing its knowledge of the Venezuelan government's intent to

seize the Plant.  Thus, Interaudi argues that on its version of the facts, the NYUCC's fraud

exception applies and Interaudi need not pay Great Wall pursuant to the Letter of Credit.  (Dkt.

No. 59 ("Interaudi Opp.") at 2-3, 8-12.)  *See* NYUCC § 5-109(a) & discussion *supra* Part III.  As

for the conversion claim, Interaudi argues that the discounting transaction was never completed and therefore that Great Wall never owned the discounted funds that are the subject of that claim. (*Id.* at 4, 17.)  Interaudi has not had the opportunity to discover information necessary to substantiate its arguments.  Accordingly, summary judgment is not appropriate at this stage in the proceedings.  *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 304 (2d Cir. 2003) ("[S]ummary judgment may be inappropriate where the party opposing it shows that he cannot at the time present facts essential to justify his opposition." (internal quotation marks and ellipsis omitted)); *see also* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it.").

## VI.   Conclusion

For the foregoing reasons, it is hereby ORDERED that:

Interaudi's motion for summary judgment on its interpleader counterclaim is DENIED and Great Wall's motion for summary judgment dismissing the interpleader counterclaim is GRANTED;

The ICA Defendants' motion to stay the action and compel arbitration is DENIED as moot;

Interaudi's motion for judgment on the pleadings on Great Wall's claims is GRANTED with respect to Great Wall's civil theft claim, and DENIED with respect to all other claims; Great Wall's motion for partial summary judgment is DENIED without prejudice to renewal at a later date;

The stay of discovery is hereby lifted.

The Clerk of Court is directed to close the motions at Docket Numbers 34, 42, and 52.


SO ORDERED.


Dated: July 24, 2015
       New York, New York

_____
            J. PAUL OETKEN
       United States District Judge